445 S.E.2d 184

**NATIONWIDE MUTUAL INSURANCE COMPANY, Plaintiff Below,**

v.

**DAIRYLAND INSURANCE COMPANY, a corporation; and Sentry Claims Service, a corporation, Defendants Below.**

No. 22019.

Supreme Court of Appeals of West Virginia.

Submitted May 4, 1994.

Decided May 20, 1994.

244

John A. Hutchison, Charleston, for plaintiff.

Anita R. Casey, Meyer, Darragh, Buckler, Bebenek & Eck, Charleston, for defendants.

MILLER, Justice:

This case involves several certified questions relating to whether an insurance carrier that pays its insured's medical payments under its policy may through the subrogation clause in its policy recover them from the liability carrier of the tortfeasor.

## I.

Nationwide Mutual Insurance Company (Nationwide) insured Sharon Salyers, whose vehicle was struck by James Justice on June 29, 1987. Mr. Justice was insured by Dairyland Insurance Company (Dairyland).[1] It is conceded for purposes of the certified ques-

---

1. Sentry Claims Service, which investigated the accident on behalf of Dairyland, was also sued. For purposes of this opinion, Sentry Claims Service is treated as an agent of Dairyland. Consequently, notice to it is deemed to be notice to Dairyland.

tions that Mr. Justice was negligent in operating his vehicle. Nationwide paid Ms. Salyers' medical expenses in the amount of $2,325.25. On November 4, 1987, Nationwide, by letter, informed Dairyland that it was seeking reimbursement of its medical payments although no dollar amount was stated.

On March 3, 1988, Dairyland settled with Ms. Salyers for $500 and received from her a full and complete release. Thereafter, on December 27, 1988, Nationwide, by letter, again informed Dairyland that it was seeking reimbursement of its medical payments through subrogation. In this letter, it set out the exact dollar amount claimed, i.e., $2,325.25. According to Nationwide, this letter was followed by a January 27, 1989, letter to Dairyland in which Nationwide asked for a response.

Nationwide asserts it received a response on January 30, 1989, from Dairyland advising of its March 3, 1988, settlement with and release by Ms. Salyers and stating that it would not honor Nationwide's subrogation claim. Subsequently, Nationwide filed suit in the Circuit Court of Raleigh County, and ultimately the circuit court certified four questions and gave the following answers:

"1. Is a written communication, by one insurance carrier to another insurance carrier, of the first carrier's intention to seek reimbursement from the second carrier for medical expenses paid by the first carrier to, or on behalf of, its insured a legally sufficient and legally enforceable notice of a claim? [Answer: Yes.]

"2. Is the communication from the first carrier to the second carrier required to include a sum certain sought as reimbursement to be valid and enforceable? [Answer: No.]

"3. Does a release executed by the first insurance carrier's insured of the second insurance carrier and its insured bar the first carrier's right of subrogation where a written communication of the claim has been made to the second carrier? [Answer: No.]

"4. Is the first insurance carrier's claim for subrogation enforceable against either its insured, the second carrier, or both and, if both, is there a priority for seeking recovery? [Answer: Yes, as to both; and the second carrier should be placed in first priority position.]"

## II.

We, along with a majority of jurisdictions,[2] have recognized as valid an insurance policy provision granting to the insurer a right of subrogation for the amount paid under the medical payments provisions in its policy. As we set out in Syllabus Point 1 of *Federal Kemper Insurance Co. v. Arnold,* 183 W.Va. 31, 393 S.E.2d 669 (1990):

" 'A provision in an insurance policy providing for the subrogation of the insurer to the rights of the insured to the extent that medical payments are advanced to such insured by the insurer is distinct from an assignment of a tort claim and is not invalid as against the public policy of this State.' Syllabus Point, *The Travelers Indemnity Co. v. Rader,* 152 W.Va. 699, 166 S.E.2d 157 (1969)." [3]

In *Carney v. Erie Insurance Co., Inc.,* 189 W.Va. 702, 705, 434 S.E.2d 374, 377 (1993), we gave the following description of the general nature of a medical payments provision in an automobile liability policy: "It is generally held that the medical payments provision in an automobile liability insurance policy is separate from the liability provisions of the policy and is akin to a personal injury accident policy. Customarily, medical payments coverage gives a defined amount of coverage for a stated premium." (Footnote omitted).

**2.** *See generally* 8A John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 4903 (1981); Annot., 19 A.L.R.3d 1054 (1968).

**3.** One of the issues in *Federal Kemper, supra,* was whether an attorney for an injured plaintiff can be reimbursed under a subrogation clause for the cost of obtaining a recovery. We stated in Syllabus Point 3:

"When an automobile insurer is reimbursed, under a subrogation clause in the insurance contract, for benefits paid to a covered person that such person has then successfully recovered from a third party, the reimbursement should be reduced by the insurer's *pro rata* share of the cost to the covered person of obtaining the recovery against the third party."

## III.

Turning to the certified questions, the first two deal with the sufficiency of the notice of the subrogation claim by Nationwide to Dairyland. As earlier noted, prior to Dairyland's settlement with Ms. Salyers, Nationwide's letter dated November 4, 1987, was sent to Dairyland advising it of Nationwide's subrogation claim. Even though the letter did not contain a specific dollar amount, it gave the accident date and the name of its insured, as well as the name of Dairyland's insured. We do not believe that because the letter did not contain the dollar amount of the subrogation claim, it was invalid.

In several cases, courts have held without any lengthy discussion that the insurer's letter to the tortfeasor's insurance carrier was sufficient to place them on notice of the subrogation claim. For example, in *Southern Pacific Transport Co. v. State Farm Mutual Insurance Co.,* 480 S.W.2d 59, 61 (Tex.Ct.App.1972), the court found there was sufficient notice where "[t]he evidence shows that Southern Pacific had knowledge of the fact that State Farm had paid its insured's claim and was subrogated to the claim in that amount. More specifically, William Gilbert, field claims representative of State Farm, notified Southern Pacific Transport Co., by letter of State Farm's claim." *See also Mulholland v. State Farm Mut. Auto. Ins. Co.,* 171 Ill.App.3d 600, 122 Ill.Dec. 657, 527 N.E.2d 29 (1988); *Employers Mut. Cas. Co. v. Meggs,* 229 So.2d 823 (Miss.1969); *Scavone v. Kings Craft Corp.,* 55 A.D.2d 807, 390 N.Y.S.2d 20 (1976).

Most courts address the adequacy of the subrogation notice in a cursory fashion as a part of the general rule dealing with the effect of a release given to the liability carrier by the insured. If the subrogation carrier gave notice to the liability carrier of its claim before the liability carrier settled with the insured, then any release obtained will not bar the subrogation claim.

Thus, in *Country Mutual Insurance Co. v. Transit Casualty Co.,* 59 Ill.App.3d 283, 16

Ill.Dec. 702, 375 N.E.2d 575 (1978), the insurance carrier gave notice of its subrogation claim prior to the settlement by the liability carrier of the insured's claim. The liability carrier argued that its settlement with and release by the insured exonerated it from any further liability. The court, in rejecting this position, stated: "Since the defendant had knowledge of plaintiff's [insurance carrier's] subrogation interest prior to execution of the release and the release did not specifically include an amount designated as covering the plaintiff's subrogation interest, the plaintiff has a cause of action against defendant based upon its subrogation claim." 59 Ill.App.3d at 285–86, 16 Ill.Dec. at 704, 375 N.E.2d at 577.

Similarly, in *Transamerica Insurance Co. v. Barnes,* 29 Utah 2d 101, 106, 505 P.2d 783, 787 (1972), the Utah Supreme Court, although somewhat divided on whether a remand was needed, had no disagreement as to this principle stated by the majority: "If the settlement were made with knowledge, actual or constructive, of plaintiff's [insurance carrier's] subrogation right, such settlement and release is a fraud on the insurer and will not affect the insurer's right of subrogation as against the tortfeasor or his insurance carrier." (Footnote omitted). *See also Ortega v. Motors Ins. Corp.,* 552 So.2d 1127 (Fla.Dist. Ct.App.1989); *Home Ins. Co. v. Hertz Corp.,* 71 Ill.2d 210, 16 Ill.Dec. 484, 375 N.E.2d 115 (1978); *Travelers Indem. Co. v. Vaccari,* 310 Minn. 97, 245 N.W.2d 844 (1976); *Milbank Ins. Co. v. Henry,* 232 Neb. 418, 441 N.W.2d 143 (1989); *Leader Nat'l Ins. Co. v. Torres,* 113 Wash.2d 366, 779 P.2d 722 (1989). *See generally* 16 George J. Couch, *Couch Cyclopedia of Insurance Law* § 61:201 (2d ed. 1983).[4]

Thus, we conclude that the trial court correctly answered the first two certified questions by stating that a written notification by the insurance carrier as to its subrogation claim for medical payments made to its insured is legally sufficient even though it does

---

4. This rule is expressed as follows in Section 61:201 of *Couch, supra:* "[I]t is generally held that where the tortfeasor obtains a release from the insured with knowledge that the latter has already been indemnified by the insurer, such release of the tortfeasor does not bar the right of subrogation of the insurer." (Footnote omitted).

not contain the precise monetary amount of the subrogation claim.

In addressing the third certified question, we believe that the subrogation rights of an insurance carrier are not barred so long as the tortfeasor's insurance carrier was notified of the subrogation claim before it settled with the insured who received the medical payments.[5] The foregoing cases are quite clear on this point. The Minnesota Supreme Court in *Travelers Indemnity Co. v. Vaccari*, 310 Minn. at 103, 245 N.W.2d at 848, gave this practical reason for disallowing the release to bar the subrogation claim:

> "To hold that such a settlement destroys an insurer's subrogation rights would have the practical effect of encouraging a tortfeasor or his liability insurer to disregard notice of an insurer's valid subrogation claim and attempt to procure a general release from the insured. We believe that the tortfeasor and his liability insurer have a duty to act in good faith under such circumstances."[6]

Moreover, to allow a release to bar a claim when it is obtained after notice of a subrogation claim would encourage such practices by a tortfeasor's insurance carrier. If a plaintiff is unrepresented, as apparently was the case here, he or she may not understand the subrogation claim process. Thus, the plaintiff may be willing to settle the liability claim for a low figure without realizing the subro-

gation claim may be asserted against him. *See Leader Nat'l Ins. Co. v. Torres, supra.* It seems clear that the tortfeasor's insurance carrier because of its superior knowledge of insurance practice and law is in a better position to be responsible for properly handling the subrogation claim than either the tortfeasor or the insured of the subrogation carrier.

With regard to the fourth certified question as to who has the priority for payment of the subrogation claim once the insured's release is not deemed to bar it, we hold that ordinarily the tortfeasor's insurance carrier is primarily responsible for payment of the subrogation claim. It is responsible because it was aware of the claim before it obtained the insured's release. There may be an occasion where the insured who is represented by counsel participated in some fraudulent scheme against the subrogation carrier[7] that would require that general priority to be reversed.[8] However, we find no such circumstance to exist in this case.

The certified questions having been answered, this case is dismissed from the docket.

Answered and dismissed.

---

5. Notification can come from the insurance carrier claiming subrogation or from the insured who has received the payments which are subject to the subrogation claim.

6. Section 61:194 of *Couch, supra*, also points out that where the insured settled with the tortfeasor before receiving any subrogation payment, then there is no right of subrogation:

> "The insurer may be barred from asserting a right of subrogation against the tortfeasor responsible for the loss or damage where the insured settled with the tortfeasor and executed a valid general release of all liability before the insurer made payment of the claim to the insured, at least in the absence of fraud or collusion. In other words, if before payment by the insurer the insured makes settlement with the tortfeasor or the one primarily liable for the loss and releases him fully from all liability, it is generally held that such release destroys the insurer's right to subrogation." (Footnotes omitted).

7. *See* note 3, *supra.*

8. Moreover, we recognize the general precept with regard to subrogation contained in Syllabus Point 10 of *State ex rel. Allstate Insurance Co. v. Karl*, 190 W.Va. 176, 437 S.E.2d 749 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1302, 127 L.Ed.2d 653 (1994):

> " ' " 'Subrogation, being a creation of equity, will not be allowed except where the subrogee has a clear case of right and no injustice will be done to another.' Syllabus, *Buskirk v. State–Planters' Bank & Trust Co.*, 113 W.Va. 764, 169 S.E. 738 (1933)." Syllabus point 6, *Fuller v. Stonewall Cas. Co. of W. Va.*, 172 W.Va. 193, 304 S.E.2d 347 (1983).' Syllabus Point 2, *Kittle v. Icard*, 185 W.Va. 126, 405 S.E.2d 456 (1991)."

*See also* Syllabus Point 11, *State ex rel. Allstate Ins. Co. v. Karl, supra.*